[Crim. No. 10105. Third Dist. Jan. 8, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
WESLEY DEAN ADAMS et al., Defendants and Appellants.

**COUNSEL**

William J. Owen and David M. Blackman, under appointments by the Court of Appeal, Johnson, Pope & Owen and Blackman & Blackman for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Eddie T. Keller and W. Scott Thorpe, Deputy Attorneys General, for Plaintiffs and Respondents.

## OPINION

**REGAN, Acting P. J.**—After joint trial by jury, a verdict of guilty of first degree murder was rendered against each defendant. Defendants each appeal from the judgments sentencing them to state prison.

On March 1, 1978, the day of the crime, defendants spent most of the day with Rose Lang who was the estranged wife of the victim, Ralph Lang. Rose was living with Hurd; Adams was staying at an adjacent house on the same property.

After drinking beer and driving around, Rose told defendants she was going to see her estranged husband, Ralph. Adams offered to drive her to Ralph's residence and Hurd accompanied them. Rose knew that each defendant owned a shotgun, but she saw no guns in the car as all three were in the front seat and she did not look in the back seat.

Ralph resided in a house trailer located at a distance of about 30 minutes driving time. Upon arrival, Rose went to the open door and while she was talking to Ralph heard a shot and saw that he had been hit in the right side. Ralph slumped sideways, Adams entered the trailer with a sawed-off shotgun and fired at Ralph inflicting a wound to the face. Adams then moved closer to the victim, placed the shotgun to the right side of his head and fired once more. He then pushed Rose out of the trailer.

Rose did not know who fired the first shot. When she returned to the car, Hurd was seated in the vehicle and when Adams pushed her in a red empty shotgun shell casing fell into her lap. As they drove away Adams asked Hurd if he had picked up his empty casing and Hurd said no. Both green and red casings were found at the scene of the crime.

The two shotguns were later placed in the trunk of Rose's automobile. Rose told her 18-year-old son, Randy, that defendants had shot Ralph.

Randy testified that Adams told him he did not want to shoot Ralph but Hurd had shot first and Adams wanted to make sure he was dead so he too shot him.

Investigating officers found an empty green shotgun casing outside the trailer. The autopsy determined the wound in the right side was potentially mortal, but the fatal wound was the one directly to the head.

Adams' sawed-off shotgun and Hurd's 12-gauge shotgun were recovered from the Yuba River. Ballistics and other scientific tests identified these weapons as having fired shots at the scene of the crime.

Found among defendant Hurd's possessions was a piece of paper headed "wipe-out list" which contained some names, the first of which was "El Dorko."[1]

## A. *Sufficiency of the Evidence*

Both defendants contend the evidence is insufficient to support the verdict of murder in the first degree. We are asked to reduce the degree to second degree murder. We shall not do so.

Adams relies principally on the case of *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], which establishes guidelines for appellate review of cases involving first degree murder and points out, in essence, that there should be three basic categories of evidence of premeditation and deliberation; "(1) facts about how and what defendant did *prior* to the actual killing show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of a 'pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id.*, at pp. 26-27.)

---

[1]"El Dorko" was a nick-name for Ralph used by Hurd. The two had been in fights with each other before the killing.

The court in *Anderson* summarized the use of the above guidelines as follows: "Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id.* at p. 27.)

■  There is extremely strong evidence of planning for the killing. Adams had his shotgun cut down or sawed-off about two weeks before the killing. The cut-off end of the barrel was buried. Hurd had previously fought with Ralph Lang and had him on his "hit-list." The two defendants were friends. They asked to accompany Rose to the trailer in which Ralph resided. However, they did not enter with her, but rather waited outside until one of them (apparently Hurd) fired the first shot through the doorway. Then Adams entered and completed the "execution-type" murder. It was so categorized, and correctly we believe, by the trial court in its comments on denial of the motion to reduce the offense to second degree murder. Moreover, both defendants indicated by statements after the crime that they had planned it. For example, Hurd stated to Rose that he never intended Ralph "to have a chance." Adams indicated to Rose after the killing that a newspaper account of the killing as an "execution-type killing" met with his approval. Further reference to the record is unnecessary since our reading of it, as summarized herein, makes it plain to us the jury had a sound basis for its verdict of first degree murder, with which we shall not interfere. (See *People* v. *Romo* (1975) 47 Cal.App.3d 976, 986 [121 Cal.Rptr. 684].)

In connection with the sufficiency of the evidence, defendant Adams' contention that Rose Lang's testimony was "inherently improbable" need only be mentioned in passing. ■  To be inherently improbable, evidence must assert something has occurred that it does not seem possible could have occurred under the circumstances disclosed. (*People* v. *Headlee* (1941) 18 Cal.2d 266, 267-268 [115 P.2d 427]; *People* v. *Mayberry* (1975) 15 Cal.3d 143, 150 [125 Cal.Rptr. 745, 542 P.2d 1337].) Rose Lang's testimony was the foundation of the People's case against both defendants. We have stated the essential probative facts above in the light most favorable to the People, as we must on appeal, and most of these facts came from her testimony. We see nothing in her testimony which does not seem possible under the circumstances disclosed.

## B. *Accomplice Issue*

Both defendants contend Rose Lang was an accomplice and the trial court was bound to have given a *sua sponte* instruction to view her testimony with distrust. We disagree.

■ An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Pen. Code, § 1111.) An accomplice is thus a principal to the crime. (Pen. Code, § 31; *People v. Hoover* (1974) 12 Cal.3d 875, 879 [117 Cal.Rptr. 672, 528 P.2d 760].) To render a person an accomplice, it must be demonstrated that he acted with guilty knowledge and intent with regard to the commission of the crime. (*Ibid.*) This issue is a question of law or fact, depending on the circumstances, i.e., where there is no dispute as to the facts or the inferences to be drawn therefrom, it is a question of law. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 433].)

Here, neither defendant presented evidence at trial which would have given rise to an inference that Rose acted with "guilty knowledge and intent with regard to the commission of the crime." (See *People v. Duncan* (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103]; *People v. Tewksbury, supra,* at p. 960.) At trial, they relied principally on cross-examination and other testimony attempting to attack Rose's credibility. Defendants failed to meet their burden of establishing evidence that Rose was an accomplice. (See *People v. Tewksbury, supra,* at p. 963.) Consequently, the trial court properly treated the matter as a question of law, decided Rose was not an accomplice and did not give an accomplice instruction.[2]

## C. *Evidence of the "Wipe-out" List*

■ Defendant Hurd contends the trial court erred in allowing testimony concerning his "wipe-out" list and in admitting it into evidence.

The prosecution introduced for identification a two-page list of names written by Hurd. Testimony was elicited by the prosecution from Rose

---

[2]It is to be noted the prosecution had submitted accomplice instructions before trial but later withdrew them as testimony progressed, without any objection to their withdrawal by either defense counsel.

Lang concerning the list. She testified, without objection from defense counsel, to the nature of the list. It was prepared by Hurd about two years before the murder, he called it his "wipe-out" list, and the first name on the list was "El Dorko," which was Hurd's nickname for Ralph Lang. Opposite the name was the word "kill."

While counsel for Hurd did not object to the testimony concerning the list, he did cross-examine Rose Lang as to it, and finally objected to its admittance into evidence. It was admitted over his objection.

Hurd contends the introduction into evidence of the list was so prejudicial that any possible relevance or probative value was outweighed by the inflammatory nature of the list. He relies on Evidence Code section 352, which provides that the trial court in its discretion "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

It is the province of the trial court to weigh the balance between probative value and prejudicial effect. (*People v. Demond* (1976) 59 Cal.App.3d 574, 586 [130 Cal.Rptr. 590]; *People v. Stanworth* (1969) 71 Cal.2d 820, 838 [80 Cal.Rptr. 49, 457 P.2d 889].) This ruling will be upset only if there is a clear showing that the trial court abused its discretion. (*People v. Murphy* (1972) 8 Cal.3d 349, 363 [105 Cal.Rptr. 138, 503 P.2d 594].)

Hurd has failed to show that (a) admission of the evidence necessitated an undue consumption of time or (b) that it created a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. Consequently, there is no showing of abuse of discretion by the trial court. To the contrary, the evidence was highly pertinent to the issue of Hurd's intent and plan, i.e., his premeditation, in connection with the killing.

### D. *Assistance of Counsel*

Defendant Hurd contends his trial counsel was ineffective in that he (1) failed to move for a severance; (2) failed to object to admission of hearsay statements; (3) failed to object to testimony regarding the "wipe-out" list; (4) failed to request accomplice instructions; and (5)

failed to object to testimony elicited by Adams' counsel relating to Hurd's prior arrests. In addition, Hurd requests this court to treat the issue of inadequacy of defense counsel as a petition for habeas corpus requiring an evidentiary hearing. We reject Hurd's contentions of inadequacy of representation as without merit and deny his request to treat this issue as a petition for habeas corpus requiring an evidentiary hearing.

The standard we must apply to Hurd's contention of inadequacy of representation is that articulated in *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859]. Under *Pope*, defendant "must show that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, [defendant] must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense." (*Id.*, at p. 425.)

We have previously determined that Rose was not an accomplice. Therefore, it was reasonable that neither of the two defense counsel nor the prosecutor requested accomplice instructions, and withdrawal by the prosecutor of those instructions earlier submitted was also reasonable. We have also previously determined the testimony regarding the "wipe-out" list was admissible; and counsel was therefore not inadequate for not objecting to its admission where such an objection would have been futile. (See *People* v. *Simms* (1970) 10 Cal.App.3d 299, 315 [89 Cal. Rptr. 1].)

As to the examination of Officer Escovedo by Adams' trial counsel, wherein it was disclosed that Escovedo had been involved with Hurd on two prior occasions, each of which resulted in an arrest, such evidence was admissible under Evidence Code section 1101. Adams' counsel advanced the theory that Hurd and Randy Degner killed Ralph Lang. Escovedo's name appeared on Hurd's "wipe-out" list. Earlier, Hurd's counsel, in his examination of Rose, had attempted to show the people on the list were really enemies of hers and not Hurd's. Adams' counsel's examination of Escovedo was an attempt to show that Hurd indeed did have a motive to kill each person on the list. Thus, the evidence was admissible as part of Adams' attempt to show that he was being "framed" by Hurd or Rose, or both.

Also, it was a reasonable tactical decision not to object to Escovedo's testimony since it reflected that during the arrests, Hurd was not vio-

lent or abusive in language. In fact, the testimony portrayed Hurd as a very calm individual, contrary to the prosecution's theory of Hurd being violent. Defense counsel was not inadequate for failing to object to this testimony.

We do not see the failure to move for severance or to object to certain hearsay statements of Rose, Adams, Randy Degner and Inspector Shelton as grounds for holding Hurd's defense counsel so incompetent or inadequate as to call for reversal of Hurd's conviction. As was said by our Supreme Court in a leading case: "In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings." (*People* v. *Brooks* (1966) 64 Cal.2d 130, 140 [48 Cal.Rptr. 879, 410 P.2d 383].) ■ On appeal, defendant "must affirmatively show that the omissions of defense counsel involved a critical issue, and that the omissions cannot be explained on the basis of any knowledgeable choice of tactics." (*People* v. *Floyd* (1970) 1 Cal.3d 694, 709 [83 Cal.Rptr. 608, 464 P.2d 64].) Defendant Hurd has not shown this.

■ Moreover, this is not a case in which this court can conceive of no satisfactory explanation for Hurd's counsel's decision not to move for a severance or to object to the alleged hearsay statements.[3] (Cf. *People* v. *Pope, supra,* 23 Cal.3d at p. 428.)

Counsel for Hurd might well have wished to use Adams' testimony to bolster Hurd's defense of diminished capacity. Hurd's counsel attempted to show that because of a combination of alcohol and a diabetic condition Hurd was incapable of forming an intent to kill or premeditating.

A tactical reason for not seeking to sever the trial and for not objecting to the alleged hearsay statements was that by having the jury see how clearly culpable Adams was, the jury might not only accept Hurd's diminished capacity defense but conceivably might also conclude that Adams either alone or with Rose shot the victim. By having a joint trial

---

[3]These statements were contained in testimony by Rose that Adams asked Hurd if he picked up the empty casing, that Adams said they had to get rid of the guns and that Adams told Hurd he would get the gas chamber. Randy testified Adams said he didn't want to shoot Ralph but Hurd shot him first and Adams wanted to make sure he was dead. Randy also testified that Rose told him Adams and Hurd had shot Ralph. Inspector William Shelton testified that Rose told him Adams said Hurd fired the first shot.

and allowing in the alleged hearsay statements, Hurd's defense counsel was able to establish Adams as obviously the person who had fired the final and fatal shot and who afterwards might have been so desperate that he attempted to include Hurd in the crime even though Hurd was ostensibly so drunk that he could not even get out of the car or remember what went on. A separate trial would have focused the jury's attention solely on Hurd; a joint trial provided the opportunity to focus also on Adams and for the jury to get a broader picture of all the people involved.

We conclude defendant has not met the requirement of affirmatively showing to the satisfaction of this court that any of his counsel's alleged omissions involved critical issues and that the asserted omissions could not be explained on the basis of a knowledgeable choice of tactics. (See *People* v. *Floyd, supra,* 1 Cal.3d at p. 709; *People* v. *Brooks, supra,* 64 Cal.2d at p. 140.) The record demonstrates to us that Hurd's counsel performed in a manner to be expected of a reasonably competent attorney acting as a diligent advocate. (See *People* v. *Pope, supra,* 23 Cal.3d at p. 425.)

We deem it appropriate to add that had we concluded that Hurd's counsel was ineffective either as to his failure to seek a severance or to object to one or more of the alleged hearsay statements, we would not reverse this judgment. In the face of the strong evidence of Hurd's guilt, absent the testimony as to which he now complains, and in view of the fact the most damaging of the probative evidence would be available to the prosecution against Hurd in a separate trial, we do not find it to be reasonably possible the asserted failures of counsel contributed to the guilty verdict. These alleged errors or omissions of counsel are therefore declared to be harmless beyond a reasonable doubt. (See *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]; *People* v. *Pimental* (1970) 6 Cal.App.3d 729, 736 [86 Cal.Rptr. 169].)

We shall not treat defendant Hurd's brief as a petition for habeas corpus requiring an evidentiary hearing, as he requests. We have resolved the issue on appeal. Were we unable to do so, we still could not treat this brief as a petition for habeas corpus; defendant would be required to proceed by way of a *verified* petition for habeas corpus filed initially in the superior court. (See *People* v. *Pope, supra,* 23 Cal.3d at p. 428; *In re Hillery* (1962) 202 Cal.App.2d 293, 294 [20 Cal.Rptr. 759].)

The judgments are affirmed. Defendant Hurd's request to treat his brief as a petition for habeas corpus is denied.

Evans, J., and Blease, J., concurred.

A petition for a rehearing was denied February 5, 1980, and appellants' petitions for a hearing by the Supreme Court were denied March 6, 1980.